The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Peter C. Kavanaugh presiding. Thank you. Good morning. We'll first call for next call. I should say 4-23-0726 David Erickson et al. Appellants v. Knox County Wind Farm, LLC Appellees. Will counsel for the appellant please state your name for the record. Phillip Lutkehans, L-U-E-T-K-E-H-A-N-S. On behalf of the appellant. Thank you. And for the appellee. Good morning, Your Honor. Ben Jacoby, J-A-C-O-B-I. Very good. Counsel, you may proceed. May it please the court. I guess I'll kind of start with our count two, which is the motion for summary judgment granting on the procedural due process and substantive due process claim. What's important to know here, just from the get go, is there's no way for anyone based on this record to know where the wind turbines will be built. Or the effect on the neighboring properties and the people who live on. Why? There are just too many variables we don't know. We don't know the level of noise coming from the wind turbine because we don't know the specs. We don't know the locations of the wind turbines. We don't know the height of the wind turbines. That's not just one variable. It's several variables, and it's not just a movement of a wind turbine 100 feet or 200 feet. Under the way this has been approved, it allows the wind turbines to be moved thousands of feet. These variables are three very important ones, probably the most important variables in a wind turbine hearing, a wind farm hearing. And the ability to move a turbine thousands of feet because the parcels here are so large is very important. Without knowing these variables, the ZBA and County Board have no way to know what the sound or visual effects are on neighboring homes or the land being used for residential or Class A properties. We have no idea if they meet the Illinois Pollution Control Board restrictions and regulations. We have no idea if they comply with the 30-hour industry standard for shadow flicker. As it relates to substantive due process, without this information, there's no way to make an informed decision as to whether the project will be safe for or affect property values of the nearby residents. Luca Hans, could I apologize if I've mispronounced your name? Please don't worry about it. Is there any fact that was actually established at the hearing other than that wind turbines are going up? I'm sorry, I may not understand the question. I apologize, sir. Well, you listed several things that we don't know for sure. And as I read this, I'm trying to figure out whether there was anything that was known for sure, other than that they were going to construct wind turbines. Very, very little. We don't know the type of the wind turbine. We don't know the location. We don't know the noise level. We know very little other than they're going to be in this footprint and they're going to erect wind turbines. Did you make this similar argument to trial court? Yes, we did. That's in our motion. That's the motion for summary judgment. And how did the trial court respond to this? Trial court said, you know what, they have the right to make this decision under the facts that is in front of me. Which were all these same facts. So, I don't understand. Facts are something we know, not something we don't know. Well, I should say under the list of things that were not known. I should say under the record of the ZBA. That's probably a better way to say it. I'm sorry. Okay, further develop this for me. Okay. Yeah, without this information, there's no way to make an informed decision, as I said, whether the project will be safe for or affect property values of nearby residents. Why are noise restrictions exist? They exist to make sure our neighborhood is pleasant, not just to make sure our neighborhood is pleasant. They exist to protect people. Too much noise at certain levels negatively affects people's health and ability to sleep, concentrate, etc., which can lead to other health problems. Some of the more vulnerable people in our areas are affected much more than others. Also, noise restrictions exist because too much noise can affect neighboring property values. And shadow flickers exist so that people do not have to live with the strobe effect inside their homes. I'm not sure everybody understands what shadow flicker is, but if you have a question, I'm happy to answer it. Again, shadow flicker can affect certain segments of our populations more than others. If there's not enough information on these issues, then there's not enough information to know whether the health, safety, welfare of our residents are negatively affected as required under LaSalle factors. Without this evidence, the decision to approve or not approve must be seen as being arbitrary and capricious and hence violate substantive due process. Further, even if we did know the actual locations that these turbines were going up, Mr. Kaliski modeled the noise or the receivers, the homes, at the wrong place. And this is not a question of fact, this is a question of law. As can be seen by the testimony in the law on where to measure noise from on a receiving Class A property. And when I say Class A property, I mean residential parcel, and I'll explain that a little more here. Mr. Kaliski took an arbitrary number of 100 feet from each house and said that was the residential property boundary. That's not the law. There's nothing in the law that says you're only protected 100 feet away from your residence. The law is it must be modeled at the boundary of the residential usage of the property. Now that gets a little confusing, so I'll talk about it a little more. For example, if I live on a farmstead, the farm itself, the area I farm is not subject to any restrictions. Okay, for whatever reason, that's how the IPCV rules are set up. But I live in the middle of this farm, let's say, the area around my house that I use for my residential purpose, whether that's 50 feet or 250 feet away from my home, that's the farmstead, that's the residential or Class A land. Now, that makes a difference, especially in this case. We have six non-participating residents, and then think about the ability to move these thousands of feet. We have six non-participating properties that are exactly the maximum decibel level under the IPCV regulations. And we have 12 other that are within one decibel under their modeling. Okay, this isn't ours. So this becomes really concerning in an instance such as the Libby house that's in the record, where there is no farm, and that kind of goes to the other kinds of things. I described what happens when you have a farm. When you have a residence, like I have a four acre parcel, which, you know, four or five acre parcels are pretty common in rural areas such as the area we're talking about. The Libby's, for example, have a property of about five plus acres, and Mr. Libby testified that they use all of that acreage as residential only. They don't use it for a farm. They don't use it for a commercial. There's five acres of residential land. In that instance, the noise must be modeled at the edge of the property, not 100 feet from a residence. That entire five acres is the residential Class A property. No one ever modeled that. In fact, Mr. Kaliske, on cross-examination, pretty much he admitted that his decision to model at 100 feet was improper in the case of the Libby property. So since Mr. Kaliske was modeling and testifying about numbers that were clearly inaccurate, along with the inability to show location and sound levels, any decision based on that inaccurate information is plain arbitrary. Now let's talk about procedural due process. Due to these same three large unknown variables, there's no way to meaningfully cross-examine an expert on noise or shadow flicker because we don't know where they're located. So, as the Illinois Supreme Court has said regarding zoning cases, cross-examination is, quote, the most officious, I may not be saying that, effacious, I can't say that word, so don't worry about not saying my name, test for the discovery of the truth, unquote. That's the Clarin case, which we're all familiar with, quoting another Supreme Court case, Balmoral Racing Club at 151 Illinois 2nd, 367. In this instance, the ability to examine the evidence, present witnesses, and cross-examine is even more important because these are very technical issues in areas of the application. Without our cross and the ability to put in evidence, as limited as it was, no one would have known about the noise on the Libby property violated the law. Wouldn't have happened. So, that's why that's so important. How many other properties will be negatively affected when you move multiple wind turbines thousands of feet and change the amount of noise coming from each wind turbine? It's important to note that some ordinances, and Knox County does not have one of these ordinances, allows the moving of wind turbines. A certain number of feet. I've seen 100 feet, I've seen 200 feet through other counties, 250 feet. Here, the zoning ordinance does not even give that minimally. However, defendants want to give almost unfettered discretion to the wind company to put the wind turbine anywhere they want on these parcels. And remember, these are huge, large parcels. These are all farms, for the most part. So, if that's the case, and they want to go further than the ordinance allows, they should have asked for another variation and prove the hardship. Instead, they kind of grant it as a condition. A condition on a conditional use permit is a limitation. That's how conditions are set up in our zoning law. It's not an expansion. If you want to expand or have an alternative to the zoning ordinance, you need to get a variation. There's no variation here. You know, and I will talk about the defendant's major response on this issue, and that is, they'll submit to the zoning official afterwards. They're going to submit, and some zoning or building official is going to say, well, we got new plans that show where the wind turbines are going to be, and we have some calculation from an engineer that's hired by the wind company, and it looks good. First of all, that's an impossible task. And it's actually the building permit guy, I'm sorry, but it's an impossible task for a building permit guy to understand. One, they're going to receive a number of charts, and I've been doing this for nine years, and it's hard enough for me to understand, but for someone who's never done a wind turbine or a wind farm and is not familiar with the IPCB rules and where it's supposed to be measured or modeled, that's an impossible task for a guy in a small county. He's going to receive a chart with dozens if not hundreds of pages and charts that are not similar to anything he or she has ever worked on before. He or she will not know if the properties being modeled at the class A properties are accurately put on the chart, or whether the engineer is making the right calculations or using the correct standards, correct distances, and as we saw from Mr. Kaliski, he wasn't. And he missed on the Libby property. So if you don't have that opportunity to have a hearing on where the turbines are at, you run the greater risk even of having these people be affected. And then this building code official would be forced to weigh the credibility of the engineering plans received. As defendants admit in their brief, the zoning official's only authority relates to ministerial approvals. In this case, the building authority, I'm sorry. This is no longer a ministerial decision when he or she has to weigh to determine the credibility of the reports he or she has provided and whether they meet the IPCB standards. And then how do they affect the LaSalle standards, the LaSalle factors? That's why the legislature has set forth the requirements that ultimately these types of decisions have to be made by the ZBA and the county board level after a hearing and the weighing of all the evidence. Speaking of that, defendants also claim, well, we could sue afterwards, after the building permit's granted. However, unlike a zoning hearing, the nearby residents will not be advised when the building permit application has been filed or when a permit is issued. And there are time limits for filing these types of appeals. Not only is there a time limit for court, most of these ordinances, and I can't remember if Knox does, would have a time limit that you have to appeal that building officer to the zoning board of appeals. So there's time limits, and unless you know that the building permit has been filed or has been approved, you don't know what's going on. And there's no notice sent when a building permit is official, is set up, or is approved. And then, you know, so that concept of, oh, we could sue afterwards, is not consistent with the need for notice in the Counties Act, and with the requirement for an ability to cross-examine. Notice, hearing, and an opportunity to be heard and meaningfully cross-examined are there to avoid a nuisance being created at the outset. It's not like a single resident who is fighting a wind company is forced under our code, or should be under our ordinances, to have to sue this major wind company because they live next door to this. As far as administrative review, the variation, that's Count 4. The burden of proof to prove the height variation is on the applicant, in this case, the wind company. And to do that, they have to show that their burden is to demonstrate that the variation will not merely serve as a convenience to the applicant, but will alleviate some demonstrable and unusual or practical difficulties so great as to justify the variance. The only reason, given the actual record at the hearing, was that it was better economically for the wind company. In fact, their main witness, the guy from the wind company, said the reason when asked on cross-examination, the reason was it would, quote, make the project, quote, more economically viable. That is not sufficient reason to grant a variation. Well, Council, didn't they also say that if they can go to the 600 feet as opposed to 500, they can get more efficient wind turbines and they would not have to put in as many? That was said. It was, however, said by Mr. Gershon. Not anybody on behalf of the wind company was said by their lawyer. But that's not a hardship. That may be good for the county. I'm not denying that may or may not be good for the county, that they're shorter and less of them, or higher and less of them. But that's not a hardship. That's not a practical difficulty. So, that's something that maybe could have been handled on a text amendment, but it's not a variation without the hardship. I hope that makes sense. It does, and I see the distinction. I appreciate it. Thank you. And, you know, we cited three cases. I'm not going to go through River Forest Rykert-Welton that says, you know, the mere fact that the owner of a particular property in a certain zoning district can make more money out of it does not allow them to disregard the ordinance. That's not a difficulty or a hardship. Very enlightening in this section is that the defendants cite no cases in their entire response to us in this section, other than Living Word. Okay, that's the only case they cite in that entire response brief. Now, Living Word, as I think we all know, is a hugely important case in the state of Illinois. I agree. The problem is, it's dealing with conditional uses. And while part of this is a conditional use, the section we're talking about or the issue we're talking about here is a variation. Living Word does not talk about variations. It does not talk about the standard. But that's the only, the single case they cite. Otherwise, they're just trying to distinguish ours. Um, so instead, what do they do? I agree with you, Justice Darmond, and I apologize if I said your name wrong. As you, I'm used to it. But, um, they talk a lot about the findings of fact, say this, this, and this. As you well know, those findings of fact were created after the lawsuit. And those are not evidence. That's not what occurred in the hearing. The, uh, the other thing I'll try and hit, I know I only got a couple minutes here because I've been going way too long, was the procedural due process claim in count one. Um, Clarence and its progeny provide a meaningful right to cross-examine and give evidence. Statutory notice was provided, but that does not end the inquiry. If so, we wouldn't have Clarence, we wouldn't have a bunch of other cases to talk about the meaningful right to cross-examine. And I'll give you a quick hearing, I'm sure you know it, but notice was received by my clients 13 days before the hearing. That met the statute, no doubt about it. Um, we were not able to obtain the application, even though diligently attempted to obtain until six days before the hearing. Now this application is hundreds of pages, about 600 and some pages. Um, so we asked for a continuance to get experts, right? I mean, they've had years, months, these experts admit that they were preparing the reports for months. I think Mr. Kressner admitted he'd been on this project for a number of years. And so we filed a motion to at least continue. First hearing occurs on April 28th. We received no, yeah. And we filed a motion to continue, that was denied. Second hearing occurs on April 29th. After I was advised that the last day of the hearing would be the second day. They asked if I, and the reason I should say the reason we asked for the motion to continue was so we could get experts. Okay, these very technical experts and I think we say who they are, I can say in a minute. So we wanted experts to talk about these issues, review these application and talk about the issues. Um, a minute. So I say I'm done because they asked me. A minute later, for the first time, the hearing officer mentions a third hearing date. And I immediately asked to be able to bring my experts on that day, on the third hearing. He says no, because I've used all of four hours for my two experts and cross examining their six witnesses, at least four of which are clearly experts. And he said, well, they only needed an hour and 20 minutes to put on their case. Well, as we all know, cross examination takes longer, especially with experts. There was no attempt to delay. I don't think four hours on these issues is an attempt to delay. And then we heard, well, I waved. First of all, the hearing officer never relied on that. That wasn't why he got tired of having the hearing. Um, and I think I'm a, my time is about up, but, uh, I'll stop for now. And if on my reply, I'll continue that issue if it comes up. Thank you for your time. Very well. Jacoby. Jacoby or Jacoby? Jacoby. Thank you. Yeah. Thank you, Your Honor. Yes. May it please the court. Council, Mr. Luke, your hands, Mr. Leland. My name is Ben Jacoby. I represent Knox County Wind Farm or KCWF. I'm joined here by Lance Leland. He represents the county and the ZBA, but I'll be arguing on behalf of the defendants this morning. And we're asking that this court affirm the decision of the circuit court in the legislative act of the county and granting a conditional use permit or CEP sometimes to the developer here to construct and develop a wind farm. And we also ask that the court affirm the ZBA's administrative decision to grant the variance, which allowed construction up to 600 feet from the, from the ordinances requirement of 500 feet. We've also cross appealed the circuit court's denial of summary judgment on a notice defect and plaintiff's request for administrative review. So in the alternative, we asked for a reversal of the circuit court's ruling on that issue and a ruling from this court that the plaintiff's administrative review law is jurisdictionally barred for failing to provide mandatory and jurisdictional notice as required by section 3107C of the administrative review law. Mr. Luekehans glosses over a lot of the evidence that took place at the ZBA hearing. To be sure, the hearing took place over two full days of evidence and a third day of summation. And I want to provide some context for this project that is all in the record and that was important to the county's decision. And it's in the briefs, but a brief overview, the wind farm will consist up to 60 turbines and is expected to have capacity of 150 megawatts, which is enough electricity to supply over 50,000 average US homes of power on an annual basis. It's a capital investment of approximately $170 million in the area, will generate tax payments in excess of $38 million in the first 25 years of operation, of which over $21 million goes to the local schools. Property owners participating in the project receive over $30 million in payments over those 25 years, which is a new long-term source of revenue for local farms. There's over 200 participants, landowners participating in the project. It will create 200 full-time jobs during construction and 6 to 10 full-time skilled jobs during operations. So again, these are facts in the record. They were important to the rational basis of the county approving the conditional use permit for this use. And that is all subject to deference of the county. The application that was filed here, if you haven't seen a conditional use application for a project like this, it's worth looking at this one. It's a massive endeavor. There's comments that there wasn't anything in the record. It was all speculative. The proposed site and all the potential effects are heavily studied before the application is ever filed. And in addition to the general information about the project, the developer, the design standards, road usages, and other areas of interest under the WEND ordinance here, which is specifically Appendix B, Article Roman 20XX from the county zoning code, which we call the WEND ordinance or the WEX ordinance. The application included exhibits and studies, a preliminary site plan, which I'll talk about more in a moment, a complete list of the leased parcels, a summary of wildlife, and studies of impacts to wildlife in the area. Simulations of what the development would look like, including both at 500 feet and at 600 feet, a study on communications, a study on the sound effects, which we'll talk about, a study on the shadow flicker, which we'll talk about. A study by a property real estate consultant that the WEND farm will not impact property valuations of nearby properties, who also testified. A tax model and, of course, the Agricultural Impact Mitigation Agreement, which is entered into with the Illinois Department of Agriculture. And that hearing that was described a moment ago, that took place over, again, three days. The developer, as is normal in applications like this, presented its experts and its witnesses to support the application that it had filed, and the application was part of the ZBA record and all of those studies and maps and other evidence in that application are there. And, as noted, the lead developer here, Michael Kressner, testified about the project. He's sort of the jack of all trades, so he testifies and authenticates the whole application. He discussed the particular hardship and practical difficulty and the reason for the variances. Andrew Lyons was the property valuation expert, and he talked about property values. The wildlife biologist testified on potential impacts to wildlife and the project's compliance and future compliance with state and federal wildlife permitting regulations. We also produced a consultant that modeled the shadow flicker. And we produced a consultant that modeled sound generated by turbines, and they both testified. Toby, can I ask you the same question that I asked Mr. Luekehans? What fact, other than wind turbines are going to be constructed, was established as a fact, as opposed to a proposal, at the hearing? The facts that were established were that the wind farm will be located on parcels that are set forth in a site plan, a preliminary site plan, and that's at C-19. Were there specific locations identified in each instance? Preliminarily, specific locations. That preliminary word is where I questioned. As somebody totally ignorant of this process until getting into this case, really, it sounds like basically what happens is you make your best guess as to where you think these are going to be, how big they're going to be, how much sound they're going to create, how much shadow flicker they're going to create. And it's kind of a ballpark guess as to where all this is going to fall, but there is no fact other than that they're going to get built if it's approved. It's far more regulated than that, and I appreciate that that's sort of what it seems like when you hear the word preliminary site plan, but the ordinance requires specific setbacks to start. The buildable area is actually far more limited. It's not a giant 300-acre plot that we can just put it anywhere on. First, we have to comply with the setbacks in the ordinance, and after this hearing, the setbacks were 1,500 feet from any non-participating residence. You have to take a residence, and you have to draw a 1,500-foot radius around it, and when you start doing that, you immediately limit down the amount of buildable area. You also have to carve out any wetlands that have to be built, and then you do have to predict what your model turbines will be and then model their sound and shadow flicker. The reason why we don't have turbines selected at the time of the hearing in 2020 is because the development timeline here, and in particular interconnection requirements and other development aspects, prohibit a company from buying turbines in 2020. Construction won't take place for several years later, at least. This project is projected to begin construction in 2025, so you can't buy turbines in 2020. There are tens of millions of dollars. You can't buy turbines in 2020. You can't finance that purchase. Your financing partners won't allow you to buy turbines in 2020 until you have a conditional use permit in hand. What the conditional use permit tells you is, is the use going to be allowed? One, has the county decided that a wind turbine, if built in this area, would negatively impact the health, safety, comfort, morals, and general welfare of the public? Once the county has decided that turbines are okay, and the county in this case decided turbines are okay, but subject to a number of conditions. We're going to allow turbines to be built here, but we're going to regulate further by condition. We're going to limit, Mr. Luke Hansward, we're going to limit their construction further with a series of conditions and other agreements with the developer that we plant in the conditional use permit. And so we've now drawn more specifically what these turbines can look like and where they can be built. So we have setbacks that we need to adhere to. We have sound requirements. And the sound requirements are Illinois Pollution Control Board regulations. So they are a law. We have to comply with them. If we fall out of compliance, the Illinois Pollution Control Board or the landowner or the state's attorney can all seek compliance, mitigation of sound up to and including the dismantling of a turbine. So you better believe that the company has significant incentive to get it right the first time. Same with shadow flicker. So once you know the turbine, the actual turbine model, and you start overlaying setbacks, sound requirements, shadow flicker. And when I say shadow flicker, I mean the company has conditioned to and has agreed to limit shadow flicker on a non-participating residence to fewer than 30 hours per year. So the model runs the model. It's actually kind of interesting. And if you look at, you know, AR-912, which is C-2125 at the circuit court, I had all these maps blown up so I could show like here's what it looks like when you start overlaying this stuff and you have very limited buildable area. So there's a map here and it shows, you know, the turbine location and it shows, you know, where around that turbine you will have more than 30 hours of shadow flicker per year. And the model, which is a reliable model relied on by experts in this industry around the country and in every one of these hearings, the model will show, you know, it will take into account, you know, average weather. It takes into account topography and it predicts where the shadow flicker will fall more than 30 hours. And when you, and they draw a map and then they also produce a chart. So they'll have a receptor, you know, a digital receptor at each residence and the digital receptor will capture the shadow flicker and we have a chart that's produced with a receptor for each house. And so when it comes time to check compliance, the zoning officer who's going to issue the building permit, which is sort of the next stage of this, once we submit the final engineered fully baked site plan with the final shadow flicker study. The engineer, the zoning officer will be able to look, not just at this map, which, you know, can be small and you can't see that, but, you know, it's there in the record, but they can look down a chart and see, okay, receptor one got, you know, is registering 14 hours of shadow flicker annually, you know, so that box is checked. And I'm going to go through all these receptors and if there's any over 30 hours, well, you're not compliant. And it goes a step further than that, because when the turbines are actually built, just like the IPCB regulations, if it so happens that somebody checks compliance, and they can do that, they can measure, they can measure once it's built and they can measure on actual weather data over the last year, and they can measure on, and they can actually go out there and start counting, you know, when we're so inclined, if they feel like they're experiencing too much shadow flicker. And if they, if they're out of compliance and they demonstrate that, then again, either the, either they have to mitigate, they have to curtail, they have to limit the amount of times that the turbine is on, or the time of day that it's on, or they have to take it down if it's out of, if they can't comply. And again, that is a significant remedy, and one that, that highly incentivizes the wind companies to get this right the first time. So, to answer your question, Justice de Armand, when, you know, what is known at the time of the application? Well, what is known is we have a limited buildable area, we have projected turbines that we can demonstrate that, you know, if turbines are built in this area, then they will, they can be compliant. We can build a compliant project here, and it's not just sound, and it's not just, it's not just shadow, but it's also, it's also wildlife, it's also, you know, a number of other, you know, communications interference, you know, cell phone towers, etc. They have to study all these things. They have to make sure they're compliant with FAA requirements. They have to make sure that the FAA has issued determinations of no hazard, which they have here. And by the way, once those are issued, then moving these turbines actually is quite limited, because the FAA limits the amount that you can move a turbine. So, so once you have that buildable area, you show the county, hey, the project, the use that we're suggesting, the use that we're suggesting is a wind farm, and that use is compatible with other uses in the area, it won't negatively impact neighboring properties. And so, allow us to build this use subject to the conditions that you're going to place on us. We take those kind of conditions to our financing partners, everybody agrees this project is bankable, we can finance it, we go out and buy our models five years later. Now, they're going to be different models on the market then than they were in 2020. So, we're going to buy the most up-to-date models, because if you buy anything less than up-to-date, financing parties again get itchy about that, they don't want to finance inefficient models. So, you go out and you buy the most efficient models that you can, and then you go and you actually do the final engineering, the final geotech, you make sure that everything that when it's planted will stay there. And you take those reports, that final engineered fully baked report and the studies to the zoning officer who then does a ministerial review. So, the zoning officer's role at building permit application stage, which is now where we've moved to, the zoning officer's role at that stage is not to determine whether a wind turbine is the best use of the property. And why I'm doing so, as you mentioned the term role, what is our role here as the 4th District Appellate Court? Because all your arguments, I understand why, I guess why the county board made the right decision, but what are we supposed to do with all this information as the reviewing court? It's a really good question and an interesting one in recent years because the standard has changed sort of over the years since 2002 when Clarin came out, 2000. So, the standard of review here has been sort of glossed over and I think that goes to, you know, what is the court's role? What is the court looking at here as the appellate court? The standard of review here actually requires quite a bit of deference to the county's decision, and it requires the plaintiff to prove by a clear and convincing evidence of constitutional deprivation. And I'll just note that plaintiffs ignore this deference and this burden in their description of the standard of review. But deference is required, it's required by Millennium Maintenance and Supreme Court divine, and they're cited in our briefs, and that deference is required to preserve the constitutionality of 512012.1, which is the section of the Illinois County's Code that sets forth sort of the review process by the court. And Millennium Maintenance has gone on to say that that standard prohibits the court from independently re-evaluating facts or asserting judgment. So, it's not your role to weigh the credibility of facts or determine, you know, who is right and who is wrong. The court may not even conduct, and this is a quote, the court may not even conduct, may not conduct even the limited direct factual review allowed under the administrative review law, just as it could not with the legislative enactment. So, the court's role is to decide whether what the county has done is rational. The court's job is not to weigh the facts. So, when you go back to that hearing and you look at everything that was presented, you see, you know, our application and our witnesses and everybody that testified in support of the project, including landowners. And then you see evidence that was presented by the objectors, who are now the plaintiffs here, including testimony from experts from them and testimony from them themselves and other objecting landowners. And if there's evidence in the record to support the decision of the county, if there's rational basis for the county's decision, you know, then the court has to approve, the court has to affirm the county's decision. It has no choice, it can't, the court's job is not to say, well, Mr. Luekehans' witnesses were better than Mr. Jacoby's witnesses. So, we're going to side there. You can't weigh the evidence like that. That's not what the court allows. And the reason for that, to take it one step deeper, because the standard gets a little quirky in zoning cases like this. So, section 512.1 states that a decision by the county board on a special use, quote, shall be subject to de novo judicial review as a legislative decision, regardless of whether the process in relation thereto is considered administrator for other purposes. Millennium Maintenance came out and said that de novo review and that statute, de novo review, I'm using air quotes, is not the same as a regular de novo appellate as new review. Instead, what that means is just that extra evidence can be submitted to the circuit court. It does not mean that you are reviewing as new. If the court reviews as new the county's decision, then without any deference, then 12012.1 violates the separation of powers clause by placing the court into the shoes of an administrative body, which is the county in this case. And that's what Millennium Maintenance says, and that's what Divine say. So, you have to afford deference. Otherwise, you violate the separation of powers clause. And we know that the county's administrative body from Clarin, which was mentioned by Mr. Lukians. So, let me stop you there. No wonder I was confused. So, we're giving deference, but there's no manifest way to the evidence considerations here. We're supposed to just determine whether there was a rational basis for the county board's decision was, which here was frankly, just to adopt. What the zoning board said, right? Yes. So, rational basis review. What the substantive due process claim is that the county's decision violated rational basis and was arbitrary and capricious. And when you look at rational basis, we all know that that's the highest hurdle to get over. Anything that could support the county's decision supports rational basis. That's why I started with that project introduction. It wasn't just to tout the project, which we think is a good one and it's going to bring a lot of benefits. But it was also these things are things that the county considered. They're part of the rational basis consideration of the county when it undertook its review. The ZBA creates the record of evidence and makes a recommendation on the conditional use permit, which goes to the county board. The county board defers at first to a committee, which asked some more questions and then made its recommendation to the county board. And the county board votes and ultimately grants the conditional use permit with, again, the conditions that are required to keep the project within the scope that it that it deems to satisfy the public health, safety, general welfare, morals and comfort. You know, that's important to the county. So, and the county, by the way, approved this project 14 to 1. So, it was a landslide victory for the project. In this case, the county thought overwhelmingly that they had satisfied the standards. I'll kind of take that one step further. So, in Mr. Luekehan, and I know I'm running out of time, but in Mr. Luekehan's complaint, and I'll direct you specifically to paragraph 94 of the complaint, the plaintiffs list eight things that they think would be negatively impacted. And I'll just finish my thought real quick. Negatively impacted by the project. And we go through in our brief, pages 44 to 51, and we explain why each of those eight things were addressed by evidence in the record. So, there's evidence in the record, sometimes on both sides, that was weighed by the county, and the county decided that this project satisfied those criteria, and I'm out of time. So, I will pause there and be happy to address any additional questions on my rebuttal time. Very good. Thank you, council. Luekehans? Sorry, I'm on mute. I'm trying to be quick. We got a number of things. Revenue and job, we heard Mr. Jacoby talk about a lot of things. Many of which aren't in the record, we heard background, but none of that's in the record of this whole process of how it goes. Talks about revenue and jobs, not relevant. We cite the concerned citizen case to say that. He admitted this application is a massive endeavor. Imagine how hard it is to respond to this application in six days. He talked about Cressner discussed hardship. He cites in his brief, one quote, one Cressner statement. You know what that statement is? It's not economically, it's not economically as profitable. That's the only Cressner statement in the entire that they cite. It's the only time the whole thing was discussed in evidence, actually. None of the other sites they use are actually Cressner. They're either the attorney or the findings of fact. Go ahead. I'm sorry. I apologize. You know, the appellants or the appellees could give, the application could give the exact locations. It's going to create more work. But it is a massive endeavor and they've spent a lot of money. And if they want to go do soil, they could do soil borings to determine the exact locations. In this case, however, they fully admitted they will move them. Fully admitted, they're not, you know, so to say, oh, they're, they're constricted. They're constricted, but they're constricted in large areas. And I asked Mr. Kaliski and I think Mr. Cressner that could you move this 1000 feet? Yes. That completely changes the sound parameters on all these turbines if you move them that kind of distance. Okay, we heard that you can't buy, you can't get all this stuff until you get an approval. That's not in the, that's not in the record. Okay. Standard review on count. Let's talk about standard review and I understand Justice Turner why you were confused because there are a number of standards for review here. We're talking like four or five different ones depending on what we're dealing with. Count one procedural due process. It's de novo because that is the motion to dismiss. Okay, so motions to dismiss are clearly de novo. Count two, it gets confusing because you do have this statute that talks about de novo, you have this other issues, but in this case, we're not talking, we're talking about a couple different standards in there. One is substantive due process. I agree, substantive due process has to be looked at as arbitrary and capricious, no doubt. Procedural due process, which is the other part of count two. That, however, is de novo. You know, that's a question of law. Did we have the process that was due us? Count three is a deck action. That's de novo. Count four is administrative review, which is the manifest way to the evidence. We have an argument and we haven't talked about it. It's not hugely important. Motion to compel is obviously is abuse of discretion at the trial court level. And then the cross appeal is de novo. They, they argue that it's manifest way to the evidence. But that's not really what's being discussed because it's not a decision of the ZBA that's at issue here. It was a law decision made by the court. Okay, and that is the whole whether we gave the proper notice, not service, but notice to other parties. That is a question of law. It's a question of law that was made by the trial court, and hence that's a de novo issue as well. I think those were my main points that I heard from Mr. Jacoby's statement. But I do think it's important and I'll say Clarence puts force factors as to how when a procedural due process violation has occurred. And when I say that, that's the appellate court decision, not the Supreme Court. They didn't deal with this issue. But it's a private interest will be affected the risk of erroneous deprivation and the government's interest. But when they talk about presentations that are relevant and reasonable they talk about one the complexity of the issue. We've heard how complex these issues are Mr. Jacoby's actually admitted it, whether the witnesses had special expertise. Here are witnesses were sound experts, health experts and property value experts that we were not able to get in because of the timing of this hearing and the fact that, you know, and we've heard all these hearings have to occur in 60 days or something. They have to start within 60 days. That's not he didn't say today, but that's they have to start within 60 days. These hearings will sometimes take months. Mr. Jacoby and I have both been involved in those that have taken. So, I my time is out. I would just ask that you overturn the decision of the trial court. And I guess that and actually find that violations have occurred here, and then a new hearing would have to that this grant the grant of approval is improper. So I apologize. We agreed with you and overturned them what happens we send it back down for what. Well, it depends on what you're talking, which portion and that that's where it gets confusing but as you say that there's a procedural and due process violation or procedural and substantive due process violation has to be a new hearing at the CBA. If you find that there is a the findings of fact, for example, and I'm going off memory and if I miss one, please, the variations that there is no support for the variation that has to be reheard, if they want to go do that. If you grew on the fact that they didn't and we haven't talked about it attached findings of fact originally, I think you would have a new hearing on the, on the issue of the variation. Mr Jacoby's brief argues that it should be a just go back and let them rule on the findings of fact but are submit that that that's what was allowed in another case, citing the Blair case the Blair case doesn't really say that it's not clear what happened in Blair and what the thing was but so each one of these has its own kind of relief. But, and officially we think that overall, it would have to go back to the ZBA for a new new hearing that has the details of what we're asking for. And again, your time. Very good. Thank you, Councilman Kobe. Thank you. I think I have a limited time of sort of bottle because we found a cross across appeal, but I wanted to touch on a minute. Thank you. Thank you, Your Honor. So the. So first, it's, it's important to note that it's an it's an as applied challenge by these plaintiffs and case all states that, to the extent they prevail that it only prevails as to them. So, a full blown hearing is not on remand would not be appropriate, you know, even if the plaintiffs were to show that they themselves suffered some constitutional deprivation, if they could, but of course they can't that's our position. When you look at the deference granted here, the county board took everything that they submitted to the record weighted against what the, what the applicants submitted to the record and made a rational decision based on rational basis. You know when you talk about procedural due process, all that's required is notice and opportunity be heard. Notice, isn't that issue, we've established that when you look at Pasadena due process is satisfied if there's an opportunity to present objection. And there's an entire hearing of the plants in this case presenting objection they cross examined every single one of the, of the developers witnesses, until they said nothing further. They presented all of their own experts that were present on the 28th, they presented themselves. And at the end of that presentation on the 28th the question was Mr Lukey hands do you have any further evidence, and his response was, well Mr Gershon and his PowerPoint presented a summary of evidence, I would like to at least summarize some of the things that we pointed out and explain why they're relevant relevant. So then, you know, the curing officer closes evidence and moves to summation and he says well it's late tonight, so I'm going to continue this to May 6 we're going to do summations then. And then Mr looking and says well if we're going to May 6 and let me try to get some experts in and the hearing officer said, we've, we've closed evidence evidence is closed all we're doing is summarizing at this stage. And then Mr looking and submits 2400 over 2400 pages of exhibits 3636 exhibits 2400 pages, we've actually summarize them in an index in the record that you can look at that goes through what each one of them was, and they address every topic subject sound shadow property valuation visual impacts health effects, everything that would be relevant to the, to the county's decision, additional evidence 2400 pages 2451 pages if I remember correctly submitted to the county for consideration there. So you can't say that the plans didn't have an opportunity to object, they most certainly did in vigor throughout the hearing process. And the procedural due process issue when it when it goes from the use that was approved the conditional use that was approved by the county to the building permit use to the building permit application that will occur next. There's opportunity then also for objection, and to be heard. So, you know, we're Mr looking and says that landowners don't get any notice of the building permit they never know about it until they're out there, you know, digging dirt. That's not true. After the, you know, the developer goes and submits a building permit application. It has all the final engineering final baked engineering finance project here's what we're, here's what we're ready to build. And then that building permit if approved is posted on the property for everybody to see, and then they can go check out the application if they want. And if they disagree with the zoning officers decision they can appeal that to the ZBA that's in that's in their code, and if they disagree with the ZBA his opinion, they can appeal that to the circuit court, and during that time there may be a stay in place, and they can get an injunction. And there's certainly an opportunity for them to challenge the zoning officers decision during that process is the building permit get posted in relation to when work begins. I'd have to look at the expiration of the building permits, it's often. It's often a. Sometimes it's short and sometimes it's long, so I you know I don't want to misspeak it's in the, it's in the zoning ordinance, but once the building permit is issued they would have a certain amount of time to begin work, and I'm sorry, Your Honor I don't know what that is off the top of my head in Knox County it's different for each county. Sure, sure. But you know that is to say, even once work begins they can still challenge the building permit, because once the substance. Once the. Once the use is confirmed as consistent with with the LaSalle factors, which is the county's decision, then we're moving into a stage of compliance. Have we complied with all the conditions have we complied with the IPCB regulations have we complied with the shadow flicker limitations have you complied with setbacks if you complied with wetlands and everything else, and, and everybody who has an interest in this project can bring compliance challenges, and as I said earlier, a compliance challenge is a big deal. So, I think my time's out, unless there's any other questions I appreciate everybody's time this morning. Thank you for hearing our arguments. Hearing no questions. Thank you, counsel. Thank you both the court will take this matter advisement now stand in recess.